HERMANN and others, Appellants, vs. ZACHOW and another, Respondents.

*November 20—December 12, 1905.*

*Deeds: Mental competency of grantor: Evidence.*

In an action to set aside, on the ground of mental incompetency, a conveyance of all his property, real and personal, made by a man on his death-bed to his sister with whom he had lived, to the exclusion of his other sisters and brother, the positive testimony of the scrivener and the witnesses to the deed is *held* to sustain the trial court's finding that the grantor was mentally competent at the time, although the testimony of medical experts (not present when the deed was executed) was to the effect that he was in a semicomatose condition before that time and could not have regained such possession of his mental faculties as would render him capable of transacting any business.

APPEAL from a judgment of the circuit court for Outagamie county: JOHN GOODLAND, Circuit Judge. *Affirmed.*

An action to set aside a deed, made on February 13, 1904, by William Krohn, since deceased, by which he conveyed his real estate and personal property to *Minnie Zachow,* one of the defendants. It is claimed that the deceased was not mentally competent to make the deed at the time of its execution.

William Krohn, at the time of his death, was an unmarried man of about forty-one years of age. He had been engaged

in the business of teaming at the city of Appleton for years before his death, which occurred February 14, 1904. At that time and for years prior he had lived and boarded with the grantee, *Minnie Zachow,* and her husband. He left surviving him, besides this sister, four sisters and one brother, the plaintiffs in this action. His sister *Minnie* and her husband had furnished him board and lodging and had done his washing while he lived with them. For about three years prior to his death he had been in failing health, and while in that condition they rendered additional personal care and service. The last days of his life he required the care and attendance of a doctor. He took to his bed on Friday evening, February 12, 1904. His death occurred on Sunday evening, February 14, 1904, at about 11 o'clock.

Dr. Sandborn, his attending physician, was summoned at about 6 o'clock Saturday morning. He found the patient seriously ill. His testimony is to the effect that he found the deceased very sick, suffering from diabetes, and that he was in a semicomatose condition, resulting from blood poisoning incident to this malady. He testified that this comatose condition was one of extreme stupor and drowsiness, accompanied by an inability to comprehend his surroundings, and rendering the patient incapable of intelligently understanding business transactions. At about 7 o'clock Dr. Ritchie was called to consult with Dr. Sandborn, and he agreed with Dr. Sandborn concerning the nature of the malady, the condition of body, and the mental incapacity of the patient to comprehend and understand a transaction involving the conveyance of property. Their evidence tends to show that the coma would progress, and that it would render the patient nearly unconscious by 1 o'clock of that day, at which time Dr. Sandborn again saw him in a comatose condition, and that this condition would continue until his death.

The defendants adduced testimony tending to show that the deceased became seriously ill on Friday evening, and that he

had grown worse by Saturday morning; that about 7 o'clock Drs. Sandborn and Ritchie informed them that he was then in a critical condition; and that it was suggested by one of them that if any property matters were to be considered by him it should be done immediately. Mr. Krause, a friend of the deceased, who had worked for him for about eight years, testifies that he was in the house in the morning and heard some conversation between the deceased and Dr. Sandborn which Krohn comprehended and understood, and that soon after the departure of the doctors, Krohn, while alone in the room with him, spoke to him concerning his condition and property. In response to an inquiry by the witness respecting the situation of his property he informed Krause that he had not disposed of it, and directed the witness to tell the *Zachows* to get some one to attend to this matter. After conveying this request to the *Zachows* witness again spoke to the deceased about whom to get for the purpose; and was told to send for Bert Zuehlke, because he had theretofore done business for him. Zuehlke was sent for but could not come, but his father, the assistant register of deeds to his son, Bert Zuehlke, came. Zuehlke arrived at the house at about 8 o'clock, found Krohn asleep, and waited about fifteen minutes until he awoke. Krause and Zuehlke agree that, when Zuehlke went up to Krohn, they exchanged greetings and shook hands; that Krohn spoke to Zuehlke, calling him by name, and then informing him that he wished to dispose of his property, and that, upon inquiry by Zuehlke as to how he wanted to arrange it, he replied that he wished to give it to his sister *Mrs. Zachow;* that Zuehlke then asked whether he wanted any of it to go to his other relatives, and that Krohn replied that he did not, but wanted to give it all to the sister *Minnie,* with whom he lived, because he had been with her during his ill-health for the last three years; that he then told them of what his property consisted, and that he had no money and only a few small accounts due him, naming the persons who owed him; that deceased told them

the description of the lot could be taken from his deed, which would be found in his trunk; that Zuehlke then went to an adjoining room to prepare the deed, and that he requested *Zachow* to find another person to sign as a witness. He brought a Mr. Klein.

The deed was executed in the presence of Zuehlke, Krause, and Klein, who state that Zuehlke read it to Krohn, and then asked him whether that was as he wanted it; that he replied that it was, and that Krohn was then propped up in the bed to sign it; that Zuehlke then suggested to him that he could make his mark instead of writing his name, and that he did so.    The deed was then signed by the witnesses and taken by Zuehlke to the register of deeds' office, where his son affixed the acknowledgment.    This transaction occupied from an hour to an hour and a half.    Some of the relatives testify to being called and to having arrived at the house about 11 o'clock.    No other transactions are shown to have taken place indicating that Krohn was conscious and had an intelligent understanding of his surroundings, except that he communicated to those about him at different times the need of their assistance in relieving himself of his urine, up to the hour of 2 o'clock Sunday afternoon.

There is considerable opinion evidence.    The doctors give it as their opinion that it was impossible that Krohn could have been in a conscious and intelligent state of mind, as testified to by Zuehlke, Krause, and Klein, when the transaction of deeding the property is said to have occurred.    They assert that his condition shortly before and after this alleged transaction made it well-nigh impossible that he comprehended and understood such a transaction so as to make an intelligent disposition of his property, and they deny having suggested to the *Zachows* that the deceased make such disposition.    A like opinion was expressed by the other relatives respecting deceased's mental capacity at the times they saw him.

The court found that Krohn was mentally competent and

that he made the deed at the time of its execution, and that no grounds were shown for declaring it invalid. Judgment was awarded dismissing the complaint, and for costs in defendants' favor. This is an appeal from such judgment.

For the appellants there was a brief by *C. G. Cannon* and *H. C. Sloan,* and oral argument by *Mr. Sloan.*

For the respondents there was a brief by *Wilcox & Wilcox,* and oral argument by *F. M. Wilcox.*

SIEBECKER, J. The court found that Mr. Krohn had the mental capacity to make the deed at the time it purports to have been executed. This finding is assailed as not sustained by the proof, and raises the only question on this appeal. The foregoing statement gives the salient evidential facts in support and refutation of the court's conclusion. There is no controversy but that Krohn was afflicted with a serious malady at the time it is claimed that he executed this deed. It is conceded that Drs. Sandborn and Ritchie visited him professionally at about 6 o'clock on the morning of the day it was made. They express their belief that he was then in a semicomatose condition, resulting from the blood poisoning incident to the malady which afflicted him. Dr. Sandborn testified that he saw him again at about 1 o'clock in the afternoon, and states that the coma had progressed as is usual in such cases, and that it continued in its course from that time to the hour of his death, at about 11 o'clock in the evening of the next day. The expert evidence of the doctors is to the effect that the deceased was in a semicomatose condition from the morning of the day when the deed was made and executed until death, and that this condition rendered him practically unconscious and incapable of having an intelligent comprehension and understanding of his surroundings and business affairs. They also express the opinion that the deceased could not have regained such temporary possession of his intelligence and mental faculties, from this semicomatose condi-

tion, as to enable him to intelligently understand and comprehend the nature of the transactions involved in the giving of this deed.

In conflict with this conclusion respecting his mental capacity is the positive evidence of the scrivener, Zuehlke, and the witnesses to the execution of the deed. They testify, in effect, that within thirty minutes after the visit of Drs. Sandborn and Ritchie Mr. Krause, a friend of Krohn, who had worked for him for about eight years, stepped into the room; that Krohn recognized and greeted him, spoke of his illness and his property; and, in response to Krause's inquiry as to whether he had made any disposition of his property, directed that some one be sent for to prepare the papers for a disposition of it; that Julius Zuehlke soon arrived in response to such a call, and after waiting about fifteen minutes for Krohn to awake approached the bed, exchanged greetings, and, upon his inquiring what Krohn wanted him to do, Krohn stated that he wished to give his property to his sister *Mrs. Zachow,* explaining that he did not want to give any of it to his other sisters or his brother because he had lived with the *Zachows* for many years, and that *Mrs. Zachow* had cared for him during his recent years of impaired health; and that the deed was prepared, read to Krohn by Zuehlke in the presence of the witnesses, and Krohn declared it embodied and complied with his wishes and directions, and signed it in their presence in the manner stated. We cannot say that this disposition of his property was unnatural or unreasonable. It is evident that this sister gave him the care and attention required by his impaired health for some time prior to his death, and furnished him a home for a number of years.

The evidence on the question of mental capacity is in sharp conflict. There is nothing in the nature of the facts testified to by the scrivener and the witnesses to the deed of an unusual character or which they were incapable of observing correctly under the circumstances, and it cannot be rejected upon grounds of mistake or misapprehension by them. Opposed

to this is the opinion of the doctors that the impaired mental condition of Krohn, resulting from the malady which afflicted him, rendered him mentally incapable from its inception to the time of his death of transacting any business. They were not present when the deed transaction occurred; and those who were present agree in their testimony that the deceased was fully possessed of his mental faculties; that he gave an intelligent explanation, with full directions, of what he wanted done; and that he evinced a clear comprehension and understanding of his business affairs, his relations to others, and the transactions involved in the transfer made by him.

Since the circuit court heard and saw the witnesses while they testified, this gave it an opportunity to judge of their intelligence, fairness, and candor we do not possess; and we cannot say upon the record that there is a clear preponderance of the evidence against the conclusion of the trial court. Its finding that the deceased was mentally competent to make the deed must stand.

*By the Court.*—Judgment affirmed.